UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
TRANSPORT WORKERS UNION OF
AMERICA, LOCAL 252, AFL-CIO,

                            Plaintiff,

   - against -

TRANSDEV SERVICES, INC. f/k/a VEOLIA
TRANSPORTATION SERVICES, INC. d/b/a
NICE BUS,

                            Defendant.
-----------------------------------------------------------X

**MEMORANDUM & ORDER**
16-CV-4492 (RRM) (AKT)

ROSLYNN R. MAUSKOPF, Chief United States District Judge.

Plaintiff Transport Workers Union of America, Local 252, AFL-CIO ("TWU"),

commenced this action pursuant to section 301 of the Labor Management Relations Act

("LMRA") 29 U.S.C. § 185, seeking to vacate an arbitration award issued on May 29, 2016.

(Complaint (Doc. No. 1).)  Before the Court is TWU's motion for summary judgment to vacate

the arbitration award and a cross-motion for summary judgment from defendant Transdev

Services, Inc.'s f/k/a Veolia ("Veolia"), which seeks to confirm the arbitration award.  For the

reasons set forth below, TWU's motion to vacate the award is denied and Veolia's cross-motion

to confirm the award is granted.

## BACKGROUND

The following facts are undisputed.  From 1973 to 2011, Nassau County's bus service

was operated by the Metropolitan Transportation Authority ("MTA").  (Plaintiff's Rule 56.1

Statement ("Pl.'s SOF") (Doc. No. 39) ¶ 6.)  Due to a dispute with the MTA, Nassau County

replaced the MTA with Veolia, a private transportation services operator, which then began

negotiations of a collective bargaining agreement ("CBA") with TWU.  (*Id.* ¶¶ 8–9; Defendant's

Rule 56.1 Statement ("Def.'s SOF") (Doc. No. 45) ¶ 4.)  Of Veolia's 1000 employees working in

the Nassau County bus system, 800 were members of TWU.  (Def.'s SOF ¶ 6.)  Many of these

employees had previously been employed by the MTA and TWU had represented them when

they were MTA employees prior to Veolia's agreement to operate Nassau County bus system.

(Pl.'s SOF ¶ 9; Def.'s SOF ¶¶ 7–8.)  The dispute at issue between the parties relates to health

insurance provisions in the CBA – in particular, coverage for employees who had previously

worked for the MTA.

TWU members who were employed by the MTA had received health insurance through

the New York State Health Insurance Program ("NYSHIP").  (Pl.'s SOF ¶ 12; Def.'s SOF ¶ 9.)

Pursuant to the NYSHIP plan, employees who were at least 45 years old and had been employed

continuously for at least ten years were "vestees" and entitled to coverage at a set premium rate.

(Pl.'s SOF ¶ 13; Def.'s SOF ¶¶ 11–12.)  At 55 years old, the "vestees" became entitled to

coverage at no cost until age 65, when they became eligible for Medicare.  (Pl.'s SOF ¶ 13;

Def.'s SOF ¶ 13.)  Continuing NYSHIP coverage for all NYSHIP vestees was an issue in the

negotiations between TWU and Veolia.  (Pl.'s SOF ¶ 16.)  Ultimately, the parties entered into a

CBA, effective January 1, 2012, which included an agreement to continue NYSHIP coverage.

(Pl.'s SOF ¶¶ 3, 9, 17; Def.'s SOF ¶¶ 1, 30–33.)  This coverage is at the center of the dispute

between the parties.  The CBA contains the following relevant terms:

> **ARTICLE X – HEALTH AND WELFARE BENEFITS**
> **Section 1. (a)** Veolia will offer to all of its employees the health plan it proposed
> on November 2, 2011 ("The Veolia Plan") . . .  Alternatively, Veolia will provide
> a substitute plan if that is mutually agreed by the parties. Veolia will contribute
> 80% of the total cost of The Veolia Plan and employees will contribute 20% of
> the total cost of The Veolia Plan.
>
> **(b)** Employees may opt out of The Veolia Plan. For employees who choose to opt
> out of The Veolia Plan, and instead wish to continue coverage under the NYSHIP
> plan as "vestees" (45 years old with 10 years of service), or as COBRA payees,

Veolia will reimburse to those employees an amount equal to 80% of the amount that is the cost of The Veolia Plan for the costs of those employees for their payments to NYSHIP. The parties will arrange for the premiums to NYSHIP to be paid by deduction from employees' pay if allowed by law.

**Exhibit "C"**
The parties agree Veolia will provide the following supplemental benefits:
**vi. Opt-Out Program**: Employees whose health insurance expenses are covered by the spouse's health benefit plan or by another means (*i.e. independent policy*) may elect to receive a financial incentive for declining health insurance with the Company. Employees who decline coverage will receive the following incentives:

| Tier | Annual Incentive |
|---|---|
| EE Only: | $1200.00 |
| EE + Spouse | $2300.00 |
| EE + Child(ren) | $2200.00 |
| Family | $3550.00 |

(Pl.'s SOF ¶¶ 17–18; Def.'s SOF ¶¶ 40–42; *see also* CBA (Exhibit 2 to Groarke Decl. (Doc. No. 38-2); Exhibit 4 to Foster Decl. (Doc. No. 46-4)).)  After implementation of the CBA, Veolia did not provide Opt-Out Program payments to employees who were over 55 years of age and enrolled in the NYSHIP coverage.  (Pl.'s SOF ¶ 20; Def.'s SOF ¶ 55.)

On November 15, 2012, TWU filed a grievance claiming that Veolia was violating Exhibit C of the CBA by not making Opt-Out payments to members over the age of 55.  (Pl.'s SOF ¶ 21; Def.'s SOF ¶¶ 85–86; *see also* Grievance (Exhibit B to Groarke Decl. (Doc. No. 38-4); Exhibit 15 to Foster Decl. (Doc. No. 46-15)).)  On March 22, 2013, Veolia denied TWU's grievance and the matter was submitted to arbitration pursuant to the grievance process under the CBA.  (Pl.'s SOF ¶¶ 22–23; Def.'s SOF ¶¶ 87–88.)

The parties participated in arbitration hearings on August 28, 2014, and October 20, 2014, before Arbitrator Jacqueline Drucker, at which both parties had the opportunity to present evidence and witness testimony.  (Pl.'s SOF ¶ 24; Def.'s SOF ¶¶ 89–90.)  At the close of the hearings, the parties submitted post-hearing briefs.  (Pl.'s SOF ¶ 24; Def.'s SOF ¶ 91.)  On May

29, 2016, Arbitrator Drucker issued an Opinion and Award denying TWU's grievance.  (Pl.'s SOF ¶ 25; Def.'s SOF ¶¶ 95, 97; *see also* Arbitration Opinion and Award ("Arbitration Opinion") (Exhibit G to Groarke Decl. (Doc. No. 38-9); Exhibit 1 to Foster Decl. (Doc. No. 46-1).)

The provision of the CBA that was in dispute appears in Exhibit C(vi), "Employees whose health insurance expenses are covered by the spouse's health benefit plan or by another means (*i.e. independent policy*) may elect to receive a financial incentive for declining health insurance with the Company."  To be eligible for an opt-out payment, the employee must satisfy two criteria under the agreement:  "the employee must have 'declin[ed] health insurance with the Company; and . . . his or her 'health insurance expenses are covered by the spouse's health benefit plan or other means (i.e. independent plan).'"  (*Id.* at 16 (quoting Exhibit C(vi) (alterations in original).)[1]  The first criterion of eligibility is satisfied by documentation through which employees covered by NYSHIP could select to decline medical coverage.  (*Id.* at 16.)

The parties did not agree on whether the second criterion was satisfied and Arbitrator Drucker discussed both parties' arguments in the Arbitration Opinion.  TWU argued that the second criterion was satisfied because the employees over the age of 55 were covered by "another means" through NYSHIP from their years of service with the MTA.  (*Id.*)  Veolia disagreed and argued that the second criterion could not be satisfied because these employees have no "health insurance expenses" because nothing is paid by anyone to NYSHIP for their coverage.  (*Id.*)  Veolia also argued that the term "independent policy" should be interpreted to describe "another means" and therefore cannot apply to the NYSHIP coverage.  (*Id.* at 17.)

---

[1] Page numbers refer to pagination assigned by the Court's Electronic Case Filing system.

After determining the threshold question of the timeliness of TWU's grievance, (*Id.* at 15), Arbitrator Drucker found "that the former MTA . . . employees who reach age 55 and are covered by NYSHIP are not entitled to the opt-out incentive payment set forth in Exhibit C(vi) of the Collective Bargaining Agreement." (*Id.* at 15, 20.) To understand the meaning of "another means (i.e. independent policy)," Arbitrator Drucker looked to the CBA as a whole and agreed with Veolia that if she were to adopt TWU's contract interpretation, the Opt-Out payment would also apply to every vestee "for he or she also opted out of the Company plan in favor of NYSHIP coverage . . . even though the Company is providing reimbursement to those employees." (*Id.* at 18.) Arbitrator Drucker reasoned that the "unavoidable conclusion" was that NYSHIP coverage under the CBA is not an "independent policy." (*Id.*)

Arbitrator Drucker explained that this interpretation comports with Article X of the CBA, through which Veolia committed to reimburse employees who opted out of the Veolia Plan and instead continued with the NYSHIP plan as vestees. (*Id.* at 18.) Arbitrator Drucker explained that Article X allowed employees to "continue the advancement under NYSHIP to achieve the significant benefit of age-55 NYSHIP coverage into which they already had invested many years of service and dollars of premiums." (*Id.* at 19.) Article X (b) specifically addresses those "employees who chose to opt out of The Veolia Plan, and instead wish to continue coverage under the NYSHIP plan as 'vestees' (45 years old with 10 years of service)." Arbitrator Drucker reasoned that Article X (b), which refers only to "vestees," does not limit the definition of "vestees" to age 45–55 and therefore does not differentiate between "vestees" and "retirees," as TWU argues, because an employee's vested status does not change at age 55, only the reimbursement changes. (*Id.*)

While Arbitrator Drucker agreed that the parties could have found a "far clearer way" to address this point in the CBA, she concluded that as a matter of contract, "the NYSHIP coverage for the age-55 employee cannot be said to be an independent policy." (*Id.*)  As such, the second criterion for the opt-out incentive, that coverage must be secured through "another means (i.e. independent policy)" cannot be met by NYSHIP vestees, whether over age 45 or 55. (*Id.* at 20.)

On August 16, 2016, TWU initiated the instant action to vacate the arbitration award. (Compl.)  On November 1, 2019, TWU filed its motion for summary judgment to vacate the arbitration award. (TWU Mot. (Doc. No. 37).)  TWU argues, among other things, that arbitration award must be vacated because Arbitrator Drucker exceeded the power granted to her by the CBA in violation of the FAA. (*Id.* at 19–25.)  In response, Veolia argues that Arbitrator Drucker merely interpreted the contract and emphasizes the "high hurdle" that TWU must meet in order to demonstrate that an arbitration award should be vacated. (Veolia Opp. (Doc. No. 41).)

On November 5, 2019, Veolia filed its cross-motion for summary judgment to confirm the arbitration award. (Veolia Mot. (Doc. No. 44).)  Veolia argues, among other things, that the arbitration should be affirmed because Arbitrator Drucker applied well-established rules of contract construction to reach her conclusion and mere disagreement with that conclusion is not grounds for vacatur. (*Id.* at 11–18.)  Veolia also argues that Arbitrator Drucker was explicitly authorized to interpret the CBA by its terms and that courts have interpreted similar provisions as providing a basis for an arbitrator's interpretation of contractual language. (*Id.* at 21–23.)  In response, TWU argues that Arbitrator Drucker's award amended the contract, thereby violating its terms, and repeats many of the same arguments from its own motion. (TWU Opp. (Doc. No. 48).)

## STANDARDS OF REVIEW

### A.  Summary Judgment

A motion for summary judgment may not be granted unless all of the submissions taken

together "show[] that there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see El Sayed v. Hilton Hotels*

*Corp.*, 627 F.3d 931, 933 (2d Cir. 2010).  The moving party bears the burden of demonstrating

the absence of a genuine issue of material fact and, in determining whether this burden has been

met, a court must view all facts in the light most favorable to the non-moving party.  *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *El Sayed*, 627 F.3d at 933.  "When a motion for

summary judgment is properly supported by documents or other evidentiary materials, the party

opposing summary judgment . . . must set forth specific facts demonstrating that there is a

genuine issue for trial," and cannot "merely rest on the allegations or denials" contained in the

pleadings.  *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) (internal quotation marks

omitted).  "A party may not rely on mere speculation or conjecture as to the true nature of the

facts to overcome a motion for summary judgment," as "[m]ere conclusory allegations or denials

cannot by themselves create a genuine issue of material fact where none would otherwise exist."

*Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted).  Only disputes over material

facts – "facts that might affect the outcome of the suit under the governing law" – will properly

preclude the entry of summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

(1986); *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009).

### B.  Judicial Review of Arbitration Awards

"Normally, confirmation of an arbitration award is a summary proceeding that merely

makes what is already a final arbitration award a judgment of the court, and the court must grant

the award unless the award is vacated, modified, or corrected." *D.H. Blair & Co., Inc. v. Gottdiener*, 462 F.3d 95, 110 (2d Cir. 2006) (citations omitted). A court's review of an arbitration award is "severely limited" so as not to frustrate the goals of arbitration – namely to settle disputes efficiently and avoid long and expensive litigation. *Willemijn Houdstermaatschappij, BV v. Standard Microsystems Corp.*, 103 F.3d 9, 12 (2d Cir. 1997) (citation omitted).

"[T]he showing required to avoid [summary] confirmation [of an arbitration award] is very high," *D.H. Blair & Co.*, 462 F.3d at 110 (citation omitted), and a party moving to vacate an award bears "the heavy burden of showing that the award falls within a very narrow set of circumstances delineated by statute and case law." *Wallace v. Buttar*, 378 F.3d 182, 189 (2d Cir. 2004) (citation omitted). Thus, a party seeking vacatur of an arbitrator's decision "must clear a high hurdle." *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 671 (2010). "The arbitrator's rationale for an award need not be explained, and the award should be confirmed if a ground for the arbitrator's decision can be inferred from the facts of the case. Only a barely colorable justification for the outcome reached by the arbitrators is necessary to confirm the award." *D.H. Blair & Co.*, 462 F.3d at 110 (internal quotation marks and citations omitted).

## DISCUSSION

Section 10 of the FAA provides four grounds for vacating an arbitration award:

[i] where the award was procured by corruption, fraud, or undue means;
[ii] where there was evident partiality or corruption in the arbitrators, or either of them;
[iii] where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or
[iv] where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a)(1)-(4).  Additionally, a court may vacate an arbitration award on two judicially

created exceptions: (1) that the award was made in "manifest disregard of the law," *Duferco*

*Intern. Steel Trading v. T. Klaveness Shipping A/S*, 444 F.3d 383, 388 (2d Cir. 2003), and (2) that

the award violates public policy, *see United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.*,

484 U.S. 29, 42 (1987).

The Second Circuit has "consistently accorded the narrowest of readings to section

10(a)(4) permitting vacatur where the arbitrator has exceeded her powers."  *Jock v. Sterling*

*Jewelers Inc.*, 646 F.3d 113, 122 (2d Cir. 2011) (quotation omitted).  Therefore, "[t]he focus of

our inquiry in challenges to an arbitration award under section 10(a)(4) is 'whether the arbitrators

had the power, based on the parties' submissions or the arbitration agreement, to reach a certain

issue, not whether the arbitrators correctly decided that issue.'"  *Id.* (quoting *DiRussa v. Dean*

*Witter Reynolds Inc.*, 121 F.3d 818, 824 (2d Cir. 1997)).

The undisputed facts do not support TWU's claim that the arbitration award should be

vacated pursuant to section 10(a)(4) of the FAA.  TWU argues that Arbitrator Drucker violated

the terms of the CBA and thereby exceeded her powers because her award changed the terms of

the CBA in violation of Article II § 2, which states that the arbitrator "shall not have the

authority to render any opinion or make any award, (1) which amends, modifies, or changes this

Agreement or any of its terms . . . ."  (TWU Mot. at 15.)  Here, TWU quotes the Arbitration

Opinion's discussion of second criterion of Article X of the CBA ("coverage must be secured

through 'another means (i.e. independent policy)' that cannot be met" (Arbitration Opinion at

19)) to argue that Arbitrator Drucker exceeded her powers by adding a requirement – "coverage"

– as a precondition to receive the opt-out incentive.  (TWU Mot. at 15, 22–25.)  This argument

hinges on a strained reading of the CBA and Arbitration Opinion.  Exhibit C states, "Employees

whose health insurance expenses are covered by the spouse's health benefit plan or by another means (*i.e. independent policy*) may elect to receive a financial incentive for declining health insurance with the Company." The concept of coverage is central to Exhibit C, because it requires that a participant have health insurance coverage through other means in order to receive the "financial incentive." Further, Arbitrator Drucker was well within her powers to interpret the meaning of this provision pursuant to Article II of the CBA, authorizing the arbitrator to "decide all grievances and complaints" and defining "grievance" or "complaint" as "any dispute arising out of the interpretation or application of the provisions of, or attachments, to this Agreement." Far from exceeding her powers, Arbitrator Drucker interpreted the contractual provisions of the CBA and carefully considered them within the broader context of the CBA to reach the conclusion that NYSHIP was not an independent policy.

None of TWU's remaining protestations constitutes a basis upon which to vacate the arbitration award. TWU urges the Court to find that Arbitrator Drucker's interpretation of the opt-out provision does not "draw its essence from the collective bargaining agreement" but instead from "the arbitrator's own brand of industrial justice." (TWU Mot. at 21, 25, quoting *New York City & Vicinity Dist. Council of United Bhd. of Carpenters & Joiners of Am. v. Ass'n of Wall-Ceiling & Carpentry Indus. of New York, Inc.*, 826 F.3d 611, 618 (2d Cir. 2016).) TWU quibbles with several of Arbitrator Drucker's interpretations of phrases that it claims lack support in the record. Quite the opposite, the Arbitration Opinion's thorough analysis is entirely consistent with the plain language of the CBA provisions in dispute and the agreement as a whole.

In sum, it is the arbitrator's ultimate findings that TWU finds objectionable. However, the Court may not question the underlying merits of an arbitration award on these grounds.

"[T]he question of interpretation of the collective bargaining agreement is a question for the arbitrator. It is the arbitrator's construction which was bargained for; and so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation of the contract is different from his." *United Steelworkers of Am. v. Enter. Wheel & Car Corp.*, 363 U.S. 593, 599, (1960).  The parties bargained for interpretation of the CBA by an arbitrator, which is just what the parties received.  Veolia has met its burden of demonstrating that there is no genuine issue of material fact precluding summary judgment as to all portions of the arbitrator's award, as the arbitrator's decision provides more than "a barely colorable justification for the outcome reached." *D.H. Blair & Co.*, 462 F.3d at 110. Accordingly, the arbitrator's interpretation of the CBA must be confirmed.

## CONCLUSION

For the reasons stated above, TWU's motion for summary judgment is DENIED. Veolia's cross-motion for summary judgment to confirm the arbitration award is GRANTED in its entirety and the arbitrator's award is confirmed.  The Clerk of Court is respectfully directed to enter judgment for Veolia and to close the case.

SO ORDERED.

Dated: Brooklyn, New York
   September 29, 2020

*Roslynn R. Mauskopf*

_____
ROSLYNN R. MAUSKOPF
Chief United States District Judge